# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOSE R. GUZMAN-DOMINGUEZ,

     Petitioner,

v.                                                                  Civ. No. 20-745 RB/KK
                                                                    Cr. No. 16-580 RB/KK

UNITED STATES OF AMERICA,

     Respondent.

## MAGISTRATE JUDGE'S PROPOSED
## FINDINGS AND RECOMMENDED DISPOSITION

Pro se Petitioner Jose Remberto Guzman-Dominguez and his co-defendant Miguel Angel Rodriguez-Flores were arrested at the Lordsburg port of entry after an inspector found a large quantity of cocaine and heroin in Petitioner's tractor-trailer concealed behind legitimate commercial cargo. Following a joint jury trial Petitioner and Mr. Rodriguez-Flores were convicted of the crimes of conspiracy to distribute at least five kilograms of cocaine and at least one kilogram of heroin and possession with intent to distribute these controlled substances. The Court sentenced Petitioner to 180-months incarceration and a 5-year term of supervised release.

On July 23, 2020 Petitioner filed a § 2255 Motion (Doc. 1) which he amended on November 16, 2020 through a formal Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 3).[1] Collectively, these pleadings will be referred to as "the Motion."[2] Respondent the United States of America (the "Government")

---

[1] Because Petitioner is proceeding *pro se*, the Court construes his pleadings liberally but does not assume the role of his advocate. *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) ("[W]e must construe [a *pro se* litigant's] arguments liberally; this rule of liberal construction stops, however, at the point at which we begin to serve as his advocate.").

[2] Both pleadings include a July 15, 2020, letter that Petitioner handwrote in Spanish; the § 2255 Motion also includes a translation of this letter. (Docs. 1, 3.)

responded in opposition to the Motion (Doc. 19) and Petitioner filed a reply (Doc. 22). Senior United States District Judge Robert C. Brack referred this case to me pursuant to 28 U.S.C. § 636(b)(1)(B), (b)(3) and *Virginia Beach Federal Savings & Loan Association v. Wood*, 901 F.2d 849 (10th Cir. 1990), on April 12, 2022. (Doc. 6.) Having carefully considered the parties' submissions, the record, and the relevant law, I find that the Motion and record conclusively establish that Petitioner is not entitled to relief and that an evidentiary hearing is unnecessary. 28 U.S.C. § 2255(b); *Machibroda v. United States*, 368 U.S. 487, 494 (1962). I recommend that Petitioner's Motion be DENIED.

## I.  FACTUAL BACKGROUND [3]

On November 13, 2015, Petitioner, who owned a commercial truck (tractor-trailer), contracted with a company called Mirachem to transport cleaning chemicals from Phoenix, Arizona, to a buyer in Pennsylvania. (CR Doc. 146 at 34-36); *United States v. Rodriguez-Flores*, 907 F.3d 1309, 1314 (10th Cir. 2018). Shortly after 3:00 p.m. that day, Petitioner and his partner Mr. Rodriguez-Flores arrived at Mirachem, where that company's employees loaded the chemicals into Petitioner's trailer. (CR Doc. 146 at 36, 70, 92); *Rodriguez-Flores*, 907 F.3d at 1314-15. A Mirachem employee then gave Petitioner a bill of lading describing the chemical cargo and a commercial seal. (CR Doc. 146 at 38:17-2171-72); *Rodriguez-Flores*, 907 F.3d at 1315.

A commercial seal is used to prevent tampering with or theft of the cargo. (CR Doc. 143:20-25; CR Doc. 145 at 91:8-23, 254:10-16; CR Doc. 146 at 29:18-21) After the seal is placed on the trailer doors, the cargo area cannot be opened without breaking the seal, and the

---

[3] The following background information is derived from the evidence presented at Petitioner's joint trial and from the Tenth Circuit's Opinion affirming Petitioner and Mr. Rodriguez-Flores's convictions. *See* CR Docs. 23, 120, 143-147, 191; *see also United States v. Rodriguez-Flores*, 907 F.3d 1309 (10th Cir. 2018). References to "CR Doc." are to the docket in Cr. No. 16-580 RB (D.N.M.), the underlying criminal case.

seal cannot be refastened. (CR Doc. 143 at 88:2-3, 121-122, CR Doc. 145 at 254-255; CR Doc. 146 at 29:18-24.) Petitioner did not affix Mirachem's commercial seal to the trailer doors, and instead placed it in the window of his truck. (CR Doc. 146 at 71-72); *Rodriguez-Flores*, 907 F.3d at 1315.

Although Mirachem employees finished loading the trailer before 4:00 p.m., Petitioner and Mr. Rodriguez-Flores did not leave Phoenix until after 7:30 p.m. (CR Doc. 144 at 28, 54, 107, 154; CR Doc. 146 at 42, 77, 101); *Rodriguez-Flores*, 907 F.3d at 1315. Petitioner testified that during this nearly 4-hour delay, he and Mr. Rodriguez-Flores stopped for fuel at a truck stop, showered, ate two meals[4], and had repairs performed on the tractor-trailer at Vazquez Diesel. (CR Doc. 146 at 41-42.) "[D]ata retrieved from a GPS device found on the dash of the cab of [Petitioner's] truck shows that it was at Vazquez Diesel at 2:35 p.m. and 7:40 p.m." *Rodriguez-Flores*, 907 F.3d at 1316 (*see also* CR Doc. 145 at 185-186). "In his state police interview Rodriguez-Flores said that after loading the truck at Mirachem they returned to Vazquez Diesel . . . , 'ate and then . . . hit the road'" . . . In his [Department of Homeland Security] interview Rodriguez-Flores said that after getting the load they took about an hour to return to Vazquez Diesel and get something to eat before leaving Phoenix." *Id.* (internal citation omitted.)

Early the next day, at 12:29 a.m., Petitioner drove into the port of entry in Lordsburg, New Mexico, where New Mexico Transportation Inspector Jesus Salcedo conducted a routine inspection of the trailer and its contents. (CR Doc. 143 at 67-77, 88-90; CR Doc. 212-1 at 4; CR Doc. 37 at 2; CR Doc. 38 at 3, CR Doc. 146 at 102:2–4.) Inspector Salcedo noted that Petitioner's logbook reflected that he had been off duty in Phoenix, Arizona for seven days just

---

[4] Petitioner "testified that they ate at the Flying J at 4:30 p.m. and then at Vazquez Diesel about 7:30 p.m. while waiting for the repairs. But in a post[-]arrest interview he had stated that he had not eaten since 4:30 p.m." *Rodriguez-Flores*, 907 F.3d at 1317.

prior to picking up the load at Mirachem, which Inspector Salcedo found unusual because Petitioner and his company were based in Las Vegas, Nevada. (CR Doc. 143 at 77-83, 88.) Upon further questioning Petitioner told Inspector Salcedo that he had actually flown to El Salvador for a week to visit his sick father. (CR Doc. 88:20-23.) Rodriguez-Flores told Agent Salcedo that he was with Petitioner because he wanted to learn the trucking business. (*Id.* at 88:24-25, 89:1-5.)

Inspector Salcedo continued with his visual inspection, during which Petitioner kept interrupting and making various statements about the truck, including making false claims about installing new parts. (CR Doc. 143 at 90-91.) Once Inspector Salcedo went to inspect the cargo, he noted that there was no commercial seal on the truck, but that the trailer doors were instead secured with a padlock.[5] (CR. Doc. 143 at 92.) When Inspector Salcedo directed Petitioner to open the lock, Petitioner unsuccessfully tried multiple keys, asked and received permission to retrieve the correct key from the truck, walked halfway to the cabin, but then stated "Oh, never mind" and returned to the doors and opened the lock. (*Id.* at 92-93.) Inspector Salcedo found this unusual because truckers are usually eager to be back on the road and thus typically prepared for inspections. (*Id.* at 93.)

After opening the trailer doors, Inspector Salcedo found seventeen large containers of cleaning chemicals and four separately labelled cardboard boxes containing green Saran-wrapped bundles that based on his experience he suspected to be illegal narcotics. (CR Doc. 212-1 at 5; CR Doc. 143 at 95-98; 145 at 9:24 to 10:19.) Inspector Salcedo then exited the trailer and

---

[5] Although Petitioner told law enforcement "that the reason he did not put the seal on the truck was that he had forgotten to do so, his explanation at trial was that it is the shipper's responsibility to place the seal on the truck, and that some companies do not attach the seal or require that it be attached." *Rodriguez-Flores*, 907 F.3d at 1315. Petitioner testified that when he was about 50 miles outside of Phoenix he instead asked Mr. Rodriguez-Flores to place a lock on the trailer doors for their "own safety" and so that no one could get into the cargo. (Doc. 146 at 73:12-23, 94:2-16, 97:1-10, 98:10-14.) However, Petitioner also acknowledged that he did not expect someone to steal the legitimate commercial cargo due to its size and weight. *Rodriguez-Flores*, 907 F.3d at 1315. Rodriguez-Flores provided the state police investigators with a puzzling explanation for the padlock: "[W]e don't know what we're carrying. So we just, we just lock it." *Id.*

called law enforcement. (CR Doc. 99-101.) New Mexico State Police arrived, inspected the packages, field-tested one, which returned positive for cocaine, and arrested Petitioner and Mr. Rodriguez-Flores. (Doc. 19 at 6; CR Doc. 143 at 183:1-3, 101-103, 141-143, 147-150; CR Doc.145 at 12:25-14:2.) Further testing later revealed that the packages contained 47.9 kilograms of cocaine and 5.24 kilograms of heroin with a total bulk value of between approximately $1,417,580.00 and $1,990,900. (CR Docs. 212-1 at 5; 144 at 249:14 -250:4; 145 at 13:22-25- 14:1-2, 237:1-25—239:1-25.)

In connection with the arrest of Petitioner and Mr. Rodriguez-Flores, law enforcement also seized six cellular telephones. (CR Doc. 143 at 203:17-25; CR Doc. 144 at 159-162, 243- 246; CR Doc. 145 at 155-168, 188:18-22)

## II.    PROCEDURAL HISTORY

On February 11, 2016, a grand jury returned a three-count indictment against Petitioner and Mr. Rodriguez-Flores charging Petitioner with (1) conspiracy to distribute 5 kilograms and more of cocaine and 1 kilogram and more of heroin in violation of 21 U.S.C. § 846; (2) possession with intent to distribute five kilograms or more of a mixture containing cocaine in violation of 21 U.S.C. § 841(b)(1)(A); and (3) possession with intent to distribute one kilogram or more of a mixture containing heroin in violation of 21 U.S.C. § 841(b)(1)(A). (CR Doc. 23.)

The Government made a plea offer which Petitioner declined. (Docs. 19 at 16; 19-1 at 2; 22 at 9.) Petitioner proceeded to trial, represented by federal public defenders Steve Sosa and Caleb Kruckenberg. (CR Docs. 3, 36; Docs. 19, 22.) At trial, he maintained, including through his testimony, that he did not know the drugs were inside the trailer. (Docs. 22 at 5 (Petitioner's "lack of knowledge was the entire defense strategy"), 19-1 at 2.) In support of that defense, Petitioner's counsel presented evidence that Petitioner was not present when the trailer was

loaded with the cleaning chemicals, that the boxes containing the drugs would not have been visible from the back of the trailer, that Petitioner did not inspect the cargo or go more than 1.5 feet into the trailer after it was loaded at Mirachem, and that commercial seals are generally applied to the trailer to secure the shipment by the shipper, not the truck driver. (CR Docs. 146 at 28: 2–19; 146 at 37:12 to 38:16; 145 at 87:8 to 88:16; 143 at 122:4–17.) The defense also presented an expert witness on drug trafficking techniques and drug trafficking investigations who testified about drug trafficking organizations' use of unwitting couriers, including in commercial trucks. (CR Doc. 146 at 146:1–16.)

Joseph Montoya, a special agent with the Drug Enforcement Administration (DEA), testified as an expert witness for the Government (CR Doc. 145 at 224-288), in pertinent part as follows:

> Q: During the course of your career at DEA, approximately how many drug traffickers have you debriefed?
> A. That would be hundreds of drug traffickers.
> Q. And during those debriefings, did any of these drug traffickers ever tell you things that were not true?
> A. Yes.
> Q. In your professional experience, was it common or uncommon for drug traffickers to tell you things that weren't true?
> A. It was common.
> Q. Okay. And have you been involved in cases in which people who were found transporting drugs claimed to have no knowledge of those drugs?
> A. Yes.
> Q. Did you generally believe these people were telling the truth when they told you they didn't know about the drugs they were transporting?
> A. No.

(CR Doc. 145 at 256:5–22.) [6] Petitioner's counsel did not object to this testimony or request a limiting or corrective instruction. (*Id*. at 20.)

_____

[6] Agent Montoya also testified that (1) cellular telephones are tools of the trade for drug traffickers who often have several cell phones to conduct their drug operations which they keep separate from their personal cell phones, (CR Doc. 145 at 251); (2) that commercial driver drug traffickers generally wait to attach the seal until after

Before the jury began deliberating, the Court instructed the jury,

> To reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous. Your deliberations will be secret and you'll never have to explain your verdict to anyone. You must consult with one another and deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, don't hesitate to reexamine your own opinions and change your mind, if convinced that you were wrong, but don't give up your honest beliefs solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Remember at all times that you are judges, judges of the facts. You must decide whether the government has proved the defendants guilty beyond a reasonable doubt.

(CR Doc. 146 at 190–191.) During deliberations, the jury sent the following note to the Court: "Some feel that the government did not provide concrete evidence[,] and some feel that the government did provide enough evidence. Therefore, we've not come to an agreement." (Doc. 19 at 22–23; CR Doc. 147 at 3:6–10.) While it is undisputed that Petitioner did not read the note, the parties dispute whether Mr. Sosa[7] conferred with him about it. (Docs. 19 at 23; 19-1 at 4; 22 at 13.) Upon receiving the jury's note, the Court discussed it with counsel for both parties. In the discussion, Mr. Sosa objected to instructing the jury that it could "reach a verdict as to one [defendant] without a verdict as to the other," and proposed that the Court tell the jury to keep deliberating. (CR Doc. 147 at 4:20 – 5:10.) The Court proposed the following instruction: "Ladies and gentlemen, please continue to deliberate and reach agreement, if you can. Two and a half hours of deliberation after three days of trial may not be enough. Lunch is on the way. We will await further word. Thank you." (*Id.* at 5:19–23.) After Mr. Sosa asked the Court to instruct the jury that they should not "surrender [their] independent judgment[s] just to

---

they drop off the illegal contraband so that when the legitimate load is delivered, the seal will be unbroken, but that to protect against theft of the drugs, they commonly use a padlock, (CR Doc. 145 at 224-256); and (3) that it is unusual and would be unrealistic for drug trafficking organizations to use unwitting couriers to transport very valuable drugs because it creates a high risk of loss as unwitting couriers could make detours, their vehicles could break down, and the organization could lose track of the couriers, and hence, the drugs. (CR Doc. 145 at 256-260.)

[7] Mr. Kruckenberg was not present during this part of the trial. (Doc. 19-2 at 4.)

reach a verdict," the Court modified the response to instruct the jury to refer to the previously given instruction set forth above. (*Id*. at 6:1 – 15.) The jury subsequently returned a verdict finding Petitioner guilty of all three counts. (*Id*. at 7:10–23.) The jury was then polled. (*Id*. at 8.)

Petitioner filed a motion for acquittal or, in the alternative, for a new trial, which the Court denied. (CR Doc. 136, 148.) Represented by appellate counsel, Petitioner then appealed his convictions to the Tenth Circuit Court of Appeals, challenging only the admission of Agent Montoya's testimony that he did not believe persons transporting drugs who denied knowledge of the drugs. (CR Doc. 212-1 at 2–3; Doc. 199.) Because Petitioner did not object to this testimony at trial, the Tenth Circuit reviewed it for plain error and held that, while it was "clearly error to permit Montoya to testify to his opinion that drug couriers who deny knowledge of the drugs are lying" (*id*. at 21), Petitioner "had not shown the prejudice necessary to require reversal" on that ground. (*Id*. at 3.) It therefore affirmed Petitioner's convictions. (*Id*. at 27); *Rodriguez-Flores*, 907 F.3d at 1324.[8]

―――――――――――

[8] Mr. Rodriguez-Flores appealed his convictions on this ground and also challenged the sufficiency of the evidence that he knew of the contraband in the truck. In affirming Mr. Rodriguez-Flores's convictions, the Tenth Circuit characterized his challenge to the sufficiency of the evidence concerning his knowledge as "border[ing] on the frivolous. *Rodriguez-Flores*, 907 F.3d at 1318. Although it declined to "recite every item of incriminating evidence," the Tenth Circuit explained in relevant part:

Here, there is no dispute that the drugs were not in the trailer when the truck arrived at Mirachem. Thus, the possibilities are quite limited.

One possibility is that the Mirachem employees added the drugs to the legitimate cargo. The only two men who might have loaded the chemical cleaners, however, denied having added the drugs and no one else could have entered the trailer without their knowledge. The jury could have believed them based solely on their demeanor while testifying. But the suggestion that they added the drugs to the trailer is highly questionable on its face. First, they would need to be sure that their co-conspirators at Crystal Clean in Pennsylvania would be the ones unloading the trailer upon its arrival. Again, the jury could reasonably have believed the Crystal Clean witness who indicated the unlikelihood of that happening. More importantly, it is hard to believe that a Mirachem employee who added the drugs to the legitimate cargo would not protect the multimillion-dollar investment by adding a seal (and a padlock) to prevent entry into the trailer (not only by burglars but also by the driver and passenger in the vehicle) before its arrival at its destination. After all, this theory exculpates Defendants only if they were not in on the conspiracy and therefore could not be trusted by the true culprits. This theory also requires believing that someone at Mirachem had been storing four boxes containing more than 115 pounds of drugs at the facility so that they

Acting *pro se*, Petitioner filed his Motion to vacate his convictions on July 23, 2020, and the Amended Motion on November 16, 2020. (Docs. 1, 3.) The Court ordered the Government to respond to the Motion by April 20, 2022. (Doc. 5.) After the Court granted three extensions of the response deadline, the Government responded on October 6, 2022. (Docs. 10, 13, 15, 19.) In addition, the Court granted the Government's motion for an order finding that Petitioner had waived the attorney-client privilege by raising ineffective assistance of counsel claims (the "Attorney-Client Privilege Motion"). (Docs. 14, 17.) In the order, the Court noted that Petitioner had failed to respond to the motion and thus had consented to the relief requested under Local Rule 7.1. (Doc. 17 at 2); D.N.M. LR-Civ. 7.1. Thereafter, the Court denied Petitioner's motion to

---

could be quickly loaded when the trucker arrived.  Is the theory that everyone at Mirachem was in on the conspiracy?

A second possibility is that someone else entered the trailer without Defendants' knowledge and inserted the boxes of drugs. But this theory also makes no sense. (How could that other person have any confidence that the valuable cargo would safely reach the desired destination?) And besides, Defendants said that they were with the truck at all times between loading up at Mirachem and their arrival at the port of entry. Guzman-Dominguez testified at trial that even as they ate dinner at the truck stop, they kept their eyes on the truck.

The only remaining possibility is that the drugs were loaded into the trailer with the knowledge and assistance of at least one Defendant. The evidence at trial clearly established that there was ample opportunity for this to occur. Cell-phone records and GPS data showed that Defendants did not leave Phoenix for another four hours after picking up the legitimate cargo. And this possibility explains why Defendants would put a padlock on the trailer (to protect the drugs) but not the seal (which would need to be broken to later remove the drugs, thereby signaling to the recipient of the legitimate cargo that there may have been tampering with the cargo in transit).

Rodriguez-Flores is correct that some of the evidence was more incriminating against Guzman-Dominguez. The experienced commercial driver would better understand the role of the seal and why it should not be applied until the contraband had been delivered. The extra cell phones, which can suggest and corroborate drug trafficking, may have all been under the control of Guzman-Dominguez. And the expert testimony regarding the implausibility of unwitting couriers, although directed at both men, may have greater force with respect to the person in charge. But once it is established that Guzman-Dominguez was knowingly transporting the drugs, the guilt of Rodriguez-Flores readily follows. Given the very close relationship between the two Defendants—including Guzman-Dominguez purportedly paying his longtime friend for performing minimal services—one can readily infer that Guzman-Dominguez would not engage in such a risky criminal venture without informing his partner. And, in fact, Guzman-Dominguez testified that the two of them were together from the time they picked up the totes until their arrests.

*Rodriguez-Flores*, 907 F.3d at 1318-19.

reconsider the extension of time for the Government's response and, on Petitioner's motion, extended the deadline for him to file a reply. (Docs. 16, 20, 21.) Petitioner's Reply was filed by the Clerk of Court on April 24, 2023. (Doc. 22.)  On December 15, 2023, Petitioner filed a "Motion to Supplement the Reply Brief Based Upon a Change in 9th Circuit Precedence (sic)" (Doc. 23).

## III.   APPLICABLE LAW

A federal prisoner who

> claim[s] the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside, or correct the sentence.

28 U.S.C. § 2255(a). This remedy "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). Rather, to prevail on a motion under Section 2255, the movant must show a defect in the proceedings which resulted in "a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346 (1974).

A defendant's claim that he was denied the effective assistance of counsel in violation of the Sixth Amendment is cognizable in federal habeas proceedings. *See Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, the movant must satisfy both parts of a two-part test. *Id.* at 687.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* "If [the movant] is unable to show either 'deficient performance' or 'sufficient prejudice,' his claim of ineffective assistance necessarily fails." *Hooks v. Workman*, 606 F.3d 715, 724 (10th

10

Cir. 2010). Courts "may address the performance and prejudice components in any order[] but need not address both if [the movant] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998).

In the context of an ineffective assistance claim, "[j]udicial scrutiny of counsel's performance must be highly deferential[,]" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.*. Moreover, for counsel's performance to be "constitutionally defective, it must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (internal quotation marks omitted)). Hence, movants bear a heavy burden to overcome the presumption and must allege specific facts supporting their claims. *United States v. Hall*, 746 F. App'x 773, 776 (10th Cir. 2018). "[C]onclusory allegations alone, without supporting factual averments, are insufficient to state a valid claim under § 2255." *Id.*; *see United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir.1994); *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000).

Under § 2255(b), a court "shall . . . grant a prompt hearing" on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[.]" *See Machibroda*, 368 U.S. at 494 (no hearing necessary when the "files and records" show the petitioner is not entitled to relief). Conversely, where "[t]he factual allegations contained in the [movant's] motion and affidavit, and put in issue by the affidavit filed with the Government's response, relate[] primarily to purported occurrences outside the courtroom and

upon which the record could, therefore, cast no real light[,]" an evidentiary hearing may be necessary. *Id.* at 494-95. However, "the statute does not strip the district courts of all discretion to exercise their common sense," *id.* at 495, and "[d]istrict courts are not required to hold evidentiary hearings in collateral attacks without a firm idea of what the testimony will encompass and how it will support a [petitioner's] claim." *United States v. Cervini*, 379 F.3d 987, 994 (10th Cir. 2004).

On habeas review, as in other contexts, "arguments raised for the first time in a [reply] are not properly presented to the district court[.]" *Thompkins v. McKune*, 433 F. App'x 652, 660 (10th Cir. 2011) (applying this rule to habeas petition under 28 U.S.C. § 2254). Such arguments "rob[] the appellee of the opportunity to demonstrate that the record does not support an appellant's factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result." *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). Therefore, where an argument is first propounded in a reply brief, courts deem it waived. *See United States v. Moya-Breton*, 439 F. App'x 711, 715 (10th Cir. 2011) (arguments raised for the first time in a § 2255 appellate reply brief are waived). I will consider Petitioner's claims in light of the foregoing standards.

## IV.   ANALYSIS

In his Motion, Petitioner asserts that his trial defense counsel were ineffective because they 1) failed to fully investigate or present evidence supporting his theory that someone else put the drugs in the trailer without his knowledge, 2) failed to pursue a second plea offer, 3) failed to object at trial to expert witness testimony commenting on his credibility, 4) failed to read to and adequately inform him about a jury note, and 5) failed to provide him discovery until after trial

concerning a destruction of drug evidence request. [9] (Docs. 1 at 1–2, 3 at 16–17, 22 at 9–10, 16.) Because Petitioner's arguments are resolvable on the existing record, I find an evidentiary hearing unnecessary. I also find Petitioner's arguments unavailing and recommend that the Court deny his Motion.

## A. Preliminary Matters

In his Reply, Petitioner asserts that he has been denied due process in this § 2255 proceeding because first, he did not receive notice of the Government's motions for extensions of time to file an answer to the Motion and did not have an opportunity to object before the Court granted them (Doc. 22 at 6), and second, he was denied an opportunity to oppose the Attorney-Client Privilege Motion. (*Id*. at 7.) He argues that, consequently, "[a]ny evidence should be suppressed" and sanctions imposed. (*Id*. at 8.) These arguments are not well-taken.

First, Petitioner was heard on his objections to the Government's extensions: he raised them in a motion to reconsider, which the Court denied because Petitioner failed to rebut the Court's finding of good cause for the extensions or show that he was prejudiced by them. (Docs. 16, 21.) Additionally, in his Reply Petitioner still does not address the Court's finding of good cause or explain how he has been prejudiced by the extensions. (Doc. 22.)

Second, the Court granted the Attorney-Client Privilege Motion because, by raising ineffective assistance of counsel claims, Petitioner "impliedly waive[d] attorney-client privilege

---

[9] In the Motion, Petitioner also asserted that his attorney "brought [him] to trial without [his] consent" and failed to advise him that, if he testified at trial, he "could be given more levels from the sentencing table for obstructing the authorities." (Doc. 1 at 2.) The Government responded to these arguments. (Doc. 19 at 17, 18.) In his Reply, however, Petitioner abandoned these arguments by stating that he did not object to going to trial or to testifying and that these claims were "inartfully drafted" in his Motion and were not meant to challenge his decision to testify. (Doc. 22 at 10.)  Rather, he clarifies that these claims rest on the alleged failure of his attorneys to introduce evidence that supported and bolstered his testimony by failing to investigate thoroughly leaving his "credability (sic) vulnerable." (Doc. 22 at 10 ("By choosing not to investigate thoroughly his attorneys compromised his testimony prejudicing [G]uzman to an unfair trial.); ("This claim goes not to his decision to testify, but his attorney's failure to bolster his testimony[.]").

with respect to communications with his attorney necessary to prove or disprove" those claims as a matter of law. *Pinson*, 584 F.3d at 978; (Doc. 17). Although the Court noted that Petitioner did not respond[10] to the Attorney-Client Privilege Motion and cited Local Rule 7.1(b), its decision did not rest on Petitioner's consent. *See* (Doc. 17 at 2 (citing D.N.M.LR-Civ. 7.1(b) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion.")). Finally, Petitioner does not dispute most of the facts asserted in his counsels' affidavits, and, as explained herein, I find that it is not necessary to resolve the factual conflicts between Petitioner's allegations and the affidavits to resolve Petitioner's ineffectiveness claims.

On December 15, 2023, Petitioner filed a "Motion to Supplement the Reply Brief Based Upon a Change in 9th Circuit Precedence (sic)" (Doc. 23), arguing that the Court "erred in imposing an obstruction enhancement without express[ing] satisfactory findings in support of such an enhancement." (*Id.* at 1.) Petitioner requests the Court resentence him without imposing an enhancement for obstruction of justice. (*Id.*) In support, Petitioner cites to an unpublished Ninth Circuit opinion in *United States v. Ruiz*, 2023 WL 6999439 (9th Cir. 2023), which he erroneously asserts is controlling. It is well settled that § 2255 motions are not available to test the legality of matters that should have been raised on direct appeal. *See United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Cox*, 567 F.2d 930, 932 (10th Cir. 1977), *cert denied*, 435 U.S. 927 (1978). Also, when issues are raised for the first time in a reply brief, the Court may decline to consider them or allow the opposing party to respond in a surreply. *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006); *see United States v.*

---

[10] The record shows that the motion was sent to Petitioner at the address indicated on a letter he sent to the Court on January 17, 2022 (Doc. 4), which is also the address on his Reply. (Docs. 14, 17, 22.) Additionally, in a letter sent to the Court after the Attorney-Client Privilege Motion was granted, Petitioner stated only that he objected to the motion, not that he did not receive it. (Doc. 18.)

*Moya-Breton*, 439 F. App'x 711, 715 (10th Cir. 2011) (stating that ordinarily, issues raised for the first time in a reply brief are deemed waived). Because Petitioner neither raised this argument on direct appeal, nor in his § 2255 Motion, but instead makes this new challenge for the first time in an untimely motion seeking to supplement his reply, and because he has not demonstrated good cause to excuse his procedural default and his waiver, I recommend that the Court deny the Motion to Supplement.[11]

## B. Petitioner Has Not Demonstrated That His Counsel's Investigation Fell Below an Objective Standard of Reasonableness

Petitioner asserts that his trial attorneys were ineffective because they insufficiently investigated what happened between the loading of the legitimate cargo at Mirachem and Petitioner's arrival at the port of entry, including allegedly failing to adequately investigate Vazquez Diesel repair shop in Phoenix. (Docs. 1 at 1-2, 22 at 16–17.) Petitioner also asserts that his counsel failed to investigate how commercial seals work and to present evidence about commercial seals.[12] (Doc. 1 at 2, 22 at 18.) However, the record reflects that Petitioner's counsel conducted a thorough and reasonable investigation of the circumstances of his case and his

---

[11]The Presentence Investigation Report ("PSR") recommended a two-level enhancement for obstruction of justice pursuant to USSG §3C1.1 because Petitioner willfully obstructed or impeded the administration of justice with respect to the investigation and prosecution of the offenses of conviction when he gave conflicting statements in his sworn trial testimony and also because his trial testimony conflicted with his post-arrest statements to law enforcement. (CR Doc. 155, ¶¶ 20, 30.) The PSR noted that Petitioner stated in his post-arrest interview that after Mirachem loaded his truck, his only other stop in the Phoenix area was at a Flying J truck stop, and that he did not disclose the extended delay in the Phoenix area, or the stop at Vazquez Diesel. (CR Doc. 155, ¶¶ 16, 17, 20.) The PSR further noted that investigators concluded that Petitioner's statements were inconsistent with his cellular telephone records and with GPS data on the device found in his commercial vehicle. (CR Doc. 155, ¶ 16.). The Court adopted the factual findings and recommendations in the PSR. (CR Doc. 200 at 11, 14.) However, the Court ultimately varied from the guideline imprisonment range of 235-293 months and sentenced Petitioner well below his applicable guideline range to a sentence of 180 months of incarceration. (CR Docs. 155, 191, 200.)

[12]Petitioner further argues in his reply brief that his counsel were ineffective in failing to present evidence that after his arrest Mirachem "changed their policy to [require] employees [to] install the seal prior to departure." (Doc. 22 at 18.) Not only is this argument waived, but it is also belied by the trial record. The purposes and function of commercial seals was addressed repeatedly by defense counsel at trial and defense counsel elicited testimony that Mirachem changed their policy to require its employees, rather than the truck drivers, to place seals on trailers. (*See, e.g.*, CR Docs. 143 at 163:17 – 166:3; 143 at 122:4–17; 143 at 44:13–23; 145 at 90:22 to 92:16.)

defense of lack of knowledge. Petitioner's speculation about what might have been uncovered through additional investigation does not overcome the presumption that his counsel acted reasonably or show a reasonable probability that, but for counsel's failure to conduct a more thorough investigation, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694; *Burt v. Titlow*, 571 U.S. 12, 22 (2013) (noting the strong presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment"). As such, I find that Petitioner fails to meet his burden as to this claim.

Inherent in the reasonableness standard established in *Strickland* is counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. An attorney "is not required to investigate all leads as long as the decision not to pursue a particular lead, or to pursue a particular lead only so far, is reasonable under the circumstances." *Brecheen v. Reynolds*, 41 F.3d 1343, 1366 (10th Cir. 1994) (internal quotation marks omitted); *Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008). Where attorneys are apprised of potential defenses, investigate them, and reasonably choose not to pursue them, they are not ineffective. *United States v. Cox*, 83 F.3d 336, 341 (10th Cir. 1996) (holding that counsel acted reasonably where counsel investigated the defendant's alleged defense but did not raise it at trial, stating, "Counsel apparently made an informed strategic choice not to pursue [that] defense"). "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices" made after an investigation into plausible lines of defense must be respected and "will seldom if ever be found wanting." *Strickland*, 466 U.S. at 681.

In affidavits submitted as attachments to the Government's Response to Petitioner's motion, Messrs. Kruckenberg and Sosa discussed their investigation of Petitioner's case,

including his defense claiming lack of knowledge of the drugs found in his truck. (Doc. 19-1, 19-2.) In addition to retaining a retired Department of Homeland Security Agent as an expert witness who testified about the use of unwitting couriers in drug trafficking operations, counsel "worked extensively" with an investigator to try to collect evidence concerning the route Petitioner took before his arrest, including attempting, at Petitioner's request, to obtain video surveillance footage from gas stations and rest areas during Petitioner's stops. (Doc. 19-2 at 2.) However, Counsel were unable to recover such footage because the rest stops and gas stations had overwritten footage from November 13-14, 2015. (*Id.*) Mr. Sosa and his investigator also traveled to Phoenix, Arizona and visited Mirachem and Vazquez Diesel to collect evidence. However, Mr. Sosa concluded that the Vazquez Diesel "did not seem like a legitimate operation and, accordingly[,]. . . did not believe that focusing on that garage would be helpful to the defense." (Doc. 19-1 at 3.)

Counsel further averred that Petitioner's defense team "made a strategic decision that trying to attack the location evidence of where [Petitioner] was and when would not be worthwhile [because] [t]here was a GPS locator on Mr. Guzman's truck, so the government had voluminous information about [his] location." (Doc. 19-1 at 3.) Mr. Kruckenberg's affidavit also addresses his investigation of the logbooks and commercial seals. According to Mr. Kruckenberg, although he spoke extensively to Petitioner about issues surrounding his logbooks, commercial seals, and his ordinary business practices, he concluded that "any further investigation or focus on the logbooks or commercial seals was not necessary to our central argument that [Petitioner] did not have knowledge of the presence of the narcotics in the trailer." (Doc. 19-2 at 2-3.)

Under *Strickland*, the Court must defer to "properly informed strategic decisions." *United States v. Stine*, 719 F. App'x 834, 837 (10th Cir. 2018). Counsels' investigation and their decisions regarding how far to go with their investigation and that certain evidence would weaken, rather than bolster, the defense, were an exercise of their reasonable and sound professional judgment. *See Smith*, 550 F.3d at 1271 (stating that, although counsel could have done more, "the question is not whether he could have done more, but rather whether his decision not to do more was objectively reasonable, applying heavy deference to the counsel's judgments."); *Davis v. Schnurr*, 785 F. App'x 519, 527 (10th Cir. 2019) (no ineffective assistance for failure to hire an expert where counsel investigated experts and found that "most experts were unwilling to give the kind of testimony that might have helped the defense"); *Waldron v. United States*, No. 1:15-CR-41-DB, 2019 WL 6344268, at *3 (D. Utah Nov. 27, 2019) (holding that a "decision not to investigate the evidence at issue [was] sound trial strategy"). The Court will not second-guess counsels' decisions. *Strickland*, 466 U.S. at 689 (admonishing courts to avoid second-guessing counsel's defense after it has proved unsuccessful). Accordingly, I recommend that Petitioner's request for relief on this ground be DENIED.

## C. Petitioner Has Not Demonstrated Ineffective Assistance in Counsel's Failure to Secure a Second Plea Offer from the Government

Petitioner concedes that his counsel discussed the Government's only plea offer with him. (Docs. 22 at 9; *see* 19-1 at 2–3.) And he states that he did not accept the offer because it required him to name the owner of the drugs found in the trailer, which he could not do because he did not know that information and was innocent. (Doc. 22 at 9.) He argues however that his counsel were ineffective in failing to advocate for a different plea deal and states, "if the [G]overnment made an offer that did not require him to provide information as to the origin of

the drugs, he would have been willing to accept a plea" notwithstanding his innocence. (*Id.*) He then equivocates and also states that he "may have accepted a plea regardless of innocence." (*Id.*)

A defendant's Sixth Amendment right to counsel extends to the plea-bargaining process, *Lafler v. Cooper*, 566 U.S. 156, 163 (2012), but Petitioner has not established ineffective assistance of counsel here. First, he has not shown that counsel's representation fell below an objective standard of reasonableness in not pursuing a second plea offer. *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985) (applying *Strickland* to plea process). Petitioner steadfastly asserted his innocence throughout his case, and he persists in his assertion of innocence to this day. He repeatedly told his counsel that he intended to exercise his constitutional right to a jury trial because he was innocent. (Docs. 19-1 at 2-3; 19-2 at 3.) And Petitioner has not demonstrated that he asked counsel to engage in any further plea negotiations after he rejected the Government's plea offer. Under these circumstances, it was objectively reasonable for counsel to turn their attention to trial preparation after Petitioner voluntarily rejected the only plea agreement the Government offered to him.

Second, Petitioner has failed to demonstrate that counsel's failure to secure a second plea offer prejudiced him. To show prejudice, a petitioner must show that "the prosecution was willing to enter plea negotiations with [the petitioner's] counsel, or that such plea would have been acceptable to the court, or that the resulting sentence would have been different than that imposed under the Sentencing Guidelines[.]" *United States v. Boone,* 62 F.3d 323, 327 (10th Cir. 1995). Without such a showing "all that the [petitioner] urges is speculation, not a reasonable probability that the outcome would have been different." *Id.*

Petitioner does not now express willingness to accept responsibility for his role in the conspiracy or drug trafficking offenses. On the contrary, Petitioner maintains that he is actually

innocent of any wrongdoing. He continues to deny knowledge of or participation in the drug trafficking offenses for which he was convicted. He also variously maintains that he has no idea how a multi-million-dollar load of illegal narcotics ended up in his tractor trailer. These arguments are wholly inconsistent with the notion, advanced by Petitioner, that he would have accepted responsibility, pled guilty to, and established a factual basis for each element of the charges against him if he did not have to identify the source of the drugs. *Lafler*, 566 U.S. at 171 (holding that the defendant's "expressed willingness, or unwillingness, to accept responsibility for [her] actions" is relevant to the court's consideration of an ineffectiveness claim based on the rejection of a plea agreement); *see Strange v. Sec'y, Dep't of Corrs.*, No. 4:12cv505/RV/GRJ, 2015 WL 3999444, *8 (unpublished) (N.D. Fla. June 30, 2015) (concluding that it was unlikely that the petitioner would have accepted a plea throughout his habeas petition he maintained his actual innocence); *Hines v. Ricci*, Civil No. 10-4130 (DMC), 2013 WL 1285290, *21 (unpublished) (D.N.J. Mar. 26, 2013) (stating that a habeas defendant "cannot be heard to complain that he would have accepted the plea offer while maintaining his innocence").

Further, Petitioner's speculation about a plea offer he might have accepted under different circumstances cannot establish that he was prejudiced by any failure of counsel to procure a second plea offer. *See United States v. Vacarro*, 166 F.3d 350 (10th Cir. 1998) (unpublished) (stating that the petitioner "failed to establish a reasonable probability that the government was willing to negotiate a guilty plea or that his sentence would have been different if he had entered a guilty plea"); *cf. Heard v. Addison*, 728 F.3d 1170, 1184 (10th Cir. 2013) ("[B]ald, post hoc and unsupported" assertions cannot establish a reasonable probability that a petitioner would have accepted a particular plea offer). Petitioner has not demonstrated that the Government was willing to negotiate a different plea offer much less one that he would have

accepted or one contemplating a nolo-contendere or *Alford* plea which would have allowed him to maintain his innocence.[13]

Finally, the Court observes that pursuant to Rule 11(b)(3), before entering a judgment on a guilty plea, "the court must determine that there is a factual basis for the plea."  In light of Petitioner's position that he is innocent of the crimes charged, the Court could not have found a factual basis for his pleas of guilty as required by Rule 11(b)(3). In other words, it is not reasonably probable that a court would have accepted Petitioner's guilty pleas in the face of his adamant denial of guilt and his unwillingness to accept responsibility for the crimes with which he was charged and ultimately convicted.

For the foregoing reasons, Petitioner has not demonstrated ineffective assistance of counsel with regard to plea bargaining, nor could he. The Cour should deny habeas relief on this ground.

**D.   <u>Petitioner is not Entitled to Relief on the basis that Counsel erred in Failing to Object at Trial to Agent Montoya's Expert Testimony on Credibility</u>**

Petitioner argues that his counsel were ineffective because they failed to object to the admission of Agent Montoya's credibility testimony, which caused the Tenth Circuit Court of Appeals to review that issue only for plain error. (Doc. 22 at 10–11.) Because Petitioner cannot meet the prejudice prong of *Strickland*, I recommend that the Court DENY this claim.

On direct appeal, the Tenth Circuit reviewed the admission of Agent Montoya's testimony for plain error because the issue was not preserved at trial. (CR Doc. 212-1 at 20); *Rodriguez-Flores*, 907 F.3d at 1320–1321. "Plain error is '(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public

---

[13] *North Carolina v. Alford*, 400 U.S. 25 (1970).

reputation of judicial proceedings.'" *United States v. Bagby*, 696 F.3d 1074, 1084 (10th Cir. 2012) (quoting *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004)). "To show that an error affected his substantial rights, [a defendant] must establish a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Uscanga-Mora*, 562 F.3d 1289, 1295 (10th Cir. 2009) (quoting *United States v. Cook*, 550 F.3d 1292, 1298 (10th Cir. 2008)).

The Tenth Circuit held that "it was clearly error to permit Montoya to testify to his opinion that drug couriers who deny knowledge of the drugs are lying." (CR Doc. 212-1 at 21); *Rodriguez-Flores*, 907 F.3d at 1321. However, it also held that Petitioner did not establish that Agent Montoya's testimony infringed Petitioner's substantial rights, because he did not show that, but for Agent Montoya's testimony, "the result of the proceeding would have been different." (*Id*. at 22–23 (quoting *Uscanga-Mora*, 562 F.3d at 1295)); *Rodriguez-Flores*, 907 F.3d at 1322–1324. The Tenth Circuit specifically noted that "(1) Montoya did not present himself as an expert on indicia of truth-telling; (2) the incriminatory gist of the challenged statement was presented to the jury through other testimony that was not challenged at trial . . .; and (3) the evidence against Defendants was very strong." (*Id*. at 23; *Rodriguez-Flores*, 907 F.3d at 1322–1324.

The standard for showing prejudice resulting from ineffective assistance of counsel is "virtually identical to the showing required to establish that a defendant's substantial rights were affected under plain error analysis." *Hayes v. United States*, No. 2:16-CR-261 TS, 2022 WL 2065538, at *4 (D. Utah June 8, 2022) (quoting *Becht v. United States*, 403 F.3d 541, 549 (8th Cir. 2005)); *see Williams v. Trammell*, 782 F.3d 1184, 1199 n.2 (10th Cir. 2015) ("It follows that when a substantial-rights standard requires no more than *Strickland*, as is true of the federal

plain-error standard, the standards are virtually identical." (internal quotation marks and citation omitted)); *United States v. Hinson*, 475 F. App'x 298, 304 (10th Cir. 2012) ("The substantial-rights prong of plain-error review is identical in form and substance to the prejudice prong of *Strickland*[.]"). Under both analyses, Petitioner must show "a reasonable probability that absent the alleged error, the outcome of the proceeding would have been different." *Uscanga-Mora*, 562 F.3d at 1295; *Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

Because the Tenth Circuit has already held that Petitioner could not meet this standard, the Court should decline to consider Petitioner's argument resting on the same issue. "Absent an intervening change in the law of a circuit, issues disposed of on direct appeal generally will not be considered on a collateral attack by a motion pursuant to § 2255." *United States v. Prichard*, 875 F.2d 789, 791 (10th Cir. 1989). It is immaterial that Plaintiff now styles his assertions about Agent Montoya's testimony as an ineffectiveness claim. *United States v. Davis*, 406 F. App'x 268, 271 (10th Cir. 2010) (stating that, having "rejected the substance of [the petitioner's] argument on direct appeal[, it would] not re-visit the merits of [his] argument even though it is now couched as an ineffective assistance of counsel claim"); *accord United States v. Varela-Ortiz*, 189 Fed. App'x. 828, 830 (10th Cir. 2006); *United States v. Anderson*, 17 Fed. App'x. 855, 858 (10th Cir. 2001); *Hayes*, 2022 WL 2065538, at *4 ("Based upon the Tenth Circuit's analysis on direct appeal, Petitioner cannot show . . . a reasonable probability that the outcome would have been different had counsel lodged the objections of which he now complains. Therefore, this claim fails.").

Petitioner relies on *Cannon v. Mullin* for the proposition that it is possible to prevail on an ineffective assistance claim based on the admission of evidence even if the admission of

evidence would not be reversible under the plain error standard. (Doc. 22 at 11 (citing 383 F.3d 1152, 1174 (10th Cir. 2004) (*abrogated on other grounds by Cullen v. Pinholster*, 563 U.S. 170 (2011)). *Cannon* did not involve analysis of the federal plain error standard. 383 F.3d at 1174. Moreover, the paragraph to which Petitioner cites merely states that, when the standards for a showing of prejudice under an ineffective assistance of counsel analysis are more favorable to a petitioner than the prejudice showing required under state law plain error review, a petitioner may prevail under the lower standard despite failing to meet the higher standard. *Id*. at 1174 (discussing state law plain error standards). That basic proposition does not apply here because the substantial rights prong of the federal plain error standard, which was applied by the Tenth Circuit on direct appeal, "requires no more than *Strickland*[.]" *Williams,* 782 F.3d at 1199 n.2.

Petitioner has not and cannot show prejudice resulting from counsel's error in failing to object to Agent Montoya's credibility testimony. Although Agent Montoya's testimony on credibility was improper, the evidence against Petitioner was overwhelming, and he has not demonstrated in his Motion that but for this improper testimony the jury would have acquitted him of the charges. For all of these reasons, I recommend that Petitioner's Motion be denied as to this ground.

**E.  Counsel Did Not Provide Ineffective Assistance in his Treatment of the Jury Note**

Petitioner argues that his counsel "made a mistake by rejecting my request to open the message the jury sent clarifying that one part of the jury was saying that the Government did not submit enough evidence." (Doc. 1 at 2.) He also argues in his Reply that Mr. Sosa was ineffective because he permitted the jury to be coerced into delivering a verdict by failing to

either argue for a proper *Allen* charge[14] or push for a determination that the jury was deadlocked. (Doc. 22 at 13.) I find that Petitioner waived his arguments regarding the Court's response to the jury note by raising them for the first time in his Reply. *See Stump*, 211 F.3d at 533. Moreover, even if Petitioner's arguments were not waived, I find that defense counsel's performance was not deficient, and that, in any case, Petitioner was not prejudiced because the jury was properly instructed.

"In considering whether an *Allen* instruction was improperly coercive, we consider (1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations." *United States v. Rivera*, 554 F. App'x 735, 741 (10th Cir. 2014) (quoting *United States v. Cornelius*, 696 F.3d 1307, 1321 (10th Cir. 2012)). In *United States v. McElhiney*, the Tenth Circuit "recommended that the [*Allen*][15] instruction be incorporated with the other jury instructions—in other words, that it be given as part of the original jury instructions" to "temper the potential coercive effect of a [later, supplemental] *Allen* charge[.]" 275 F.3d 928, 942 (10th Cir. 2001). It further urged that, to avoid impermissible coercion, any supplemental instruction should incorporate cautionary language "(1) that no juror should relinquish his or her conscientiously held convictions simply to secure a verdict and (2) that every individual juror should reconsider his or her views, whether in the majority or in the minority." *Id*. at 949. Additionally, there should be "a reminder to the jury of the burden of proof." *Id*.

---

[14] "An *Allen* charge derives its name from the supplemental jury instruction approved by the Supreme Court in *Allen v. United States,* 164 U.S. 492, 501-02 . . .(1896)." *United States v. Arney*, 248 F.3d 984, 987 (10th Cir. 2001).

[15] In *McElhiney*, the Tenth Circuit discussed the differences between a "pure" and "modified" *Allen* charge and stated that, despite the differences, "[t]he name '*Allen* charge[]' . . . has been used to describe not only supplemental instructions provided to deadlocked juries but also charges given as part of the original jury instructions." *McElhiney*, 275 F.3d at 936.

Before deliberations began, the Court gave an instruction substantively consistent with the Tenth Circuit Pattern Jury Instruction 1.42, the "Modified *Allen* Charge." *See* Tenth Circuit Criminal Pattern Jury Instructions 2021 Use Note 1.42 ("It is the preferred practice that the substance of [instruction 1.42] be given as part of the court's original set of jury instructions, before the jury reaches impasse or deadlock." (citing *United States v. Rodriguez-Mejia*, 20 F.3d 1090, 1092 (10th Cir. 1994); *United States v. Walshe*, 526 F. App'x 834, 843 (10th Cir. 2013) (holding that language similar to the Court's instruction "substantially mirror[ed]" the pattern instruction). That instruction told each jury member "to reexamine your own opinions and change your mind, if convinced that you were wrong, but don't give up your honest beliefs solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict." (Doc. 146 at 190-191.) It also stated, "You must decide whether the government has proved the defendants guilty beyond a reasonable doubt." (*Id.*) This language therefore meets the *McElhiney* criteria.

Upon receiving the jury's note, the Court discussed it with counsel for both parties. Mr. Sosa objected to instructing the jury that it could "reach a verdict as to one [defendant] without a verdict as to the other," and proposed that the Court tell the jury to keep deliberating. (CR Doc. 147 at 4:20 – 5:10.) The Court proposed the following instruction: "Ladies and gentlemen, please continue to deliberate and reach agreement, if you can. Two and a half hours of deliberation after three days of trial may not be enough. Lunch is on the way. We will await further word. Thank you." (*Id.* at 5:19–23.) On Mr. Sosa's request to instruct the jury that they should not "surrender [their] independent judgment[s] just to reach a verdict," the Court modified the response to instruct the jury to refer to the previously given instruction. (*Id.* at 6:1–15.) Hence, the supplemental *Allen* charge also meets the *McElhiney* criteria. *Cf. McElhiney*, 275

F.3d at 942 (concluding that a supplemental *Allen* charge that "neither incorporated the language of the first [proper] instruction nor referred to it" was coercive).

Further, the supplemental *Allen* charge was given after the jury had been deliberating for two and a half hours and before the jury was polled. (Doc. 147 at 6:1–15, 8.) Rather than encouraging the jury to reach a verdict quickly, the supplemental instruction told them that lunch was forthcoming and noted that more deliberation may not be enough given the length of the trial. (Doc. 147 at 6:1 – 15.) Although it is unclear from the record how long the jury deliberated after the supplemental *Allen* charge, this factor is not dispositive. *Darks v. Mullin*, 327 F.3d 1001, 1016 (10th Cir. 2003) (stating that a "short time for deliberations may be important in determining coercion *where trial court employs faulty language in supplemental instruction*"). Considering the totality of the circumstances, I find that the supplemental *Allen* charge was not unduly coercive. *See United States v. Banuelos*, 117 F. App'x 692, 697 (10th Cir. 2004) (holding that an *Allen* charge that was "evenhanded" and emphasized that "no juror was expected to yield a conscientious conviction on the evidence" was "not impermissibly coercive"); *United States v. Rivera*, 554 F. App'x 735, 742 (10th Cir. 2014) (considering a supplemental *Allen* charge under the totality of the circumstances).

I further find that defense counsel reasonably advocated for Petitioner's interests regarding the Court's response to the jury's note. Moreover, the Court's response to the jury's note was proper under Tenth Circuit law. Hence, had his counsel "pushed to accept the verdict as returned – deadlocked" as Petitioner argues (Doc. 22 at 14), those efforts would have been meritless. When an argument "is meritless, its omission will not constitute deficient performance." *Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004); *Sperry v. McKune*, 445

F.3d 1268, 1275 (10th Cir. 2006) (counsel cannot be ineffective by failing to raise a meritless argument); *Wimbley v. Werholtz*, 187 F. App'x 840, 846 (10th Cir. 2006) (same).

Finally, because defense counsel's performance was not deficient and the jury was correctly instructed, Petitioner cannot show that he was prejudiced by not reading or being more informed about the jury note. I recommend that the Court deny the Motion as to these claims.

**F.   Petitioner's Claim Regarding Post-Trial Discovery Production Does Not Entitle Him to Habeas Relief.**

Petitioner asserts that his rights were violated because he did not receive discovery until after his trial. (Doc. 1 at 2.) He explains that after trial he found a document requesting leave to destroy 124 pounds of cocaine (the "Destruction Request"), which he maintains shows that there was no heroin found in the trailer. (Docs. 1 at 2; 22 at 20.) He thus argues that his counsel should have challenged inconsistencies between the testimony about the quantities of cocaine and heroin found in the trailer and the amount of cocaine stated in the Destruction Request. (*Id.*)

Section 2255 is not available to test the legality of matters which should have been raised on appeal. *See United States v. Allen,* 16 F.3d 377, 378 (10th Cir.1994). Petitioner did not raise a claim that his constitutional rights were violated in relation to discovery and destruction of drug evidence on direct appeal. And he has not shown cause for his procedural default and actual prejudice resulting from the alleged failure of counsel to provide him with the Destruction Request or to otherwise challenge the destruction of drug evidence. Nor has Petitioner demonstrated that a fundamental miscarriage of justice will occur if the Court does not address his claim. *See id.,* 16 F.3d at 378. The Court should deny this procedurally defaulted claim.

The procedural default rule does not apply to claims of ineffective assistance of counsel. *See Massaro v. United States,* 538 U.S. 500, 504 (2003). Thus, to the extent Petitioner's claim related to the Destruction Request rests on ineffective assistance of counsel, the Court may

consider it. I nonetheless recommend that it be denied. Both defense counsel state in their affidavits that they reviewed the discovery obtained from the Government with Petitioner. (Docs. 19-1, 19-2.) However, even if they did not share the Destruction Request with him until after trial, Petitioner does not explain how the trial or his sentence would have been different if he had reviewed it. (Doc. 22 at 20.) Petitioner's suggestion that the report was exculpatory in that it demonstrates that there was not actually heroin found in his tractor trailer is frivolous and belied by the record. Indeed, there was ample and overwhelming evidence presented to the jury concerning the large quantities of both heroin and cocaine found in Petitioner's tractor trailer. (CR Doc. 144 at 240-242, 247-250; CR Doc. 145 at 9-16 (Homeland Security Investigations Agent David Barkley, who conducted inventory search of Petitioner's tractor trailer and processed 51 bricks of seized drug evidence, testified that initially samples from only 11 bricks were tested but when testing showed that one brick was heroin and ten were cocaine, samples of all 51 bricks were field tested and 46 returned positive for cocaine and 5 bundles returned positive for heroin; describing difference in appearance and weight of the seized heroin and cocaine; and describing process for sealing and sending sampled to the Customs and Border Protection drug lab in Houston, Texas for scientific analysis); CR Doc. 145 at 26-33 (Testimony of Homeland Security Investigations forensic chemist Dustin James concerning testing of all samples from 46 bricks of cocaine and 5 bricks of heroin seized from Petitioner's tractor trailer).

For these reasons, I recommend that the Court deny Petitioner's Motion on this ground.

## G.  Petitioner's Request for an Evidentiary Hearing

I find that an evidentiary hearing is not necessary because Petitioner's claims of ineffective assistance of counsel can be resolved on the existing record. *Hooks*, 606 F.3d at 731. There is no dispute as to the facts stated in the affidavits by Mr. Sosa and Mr. Kruckenberg

regarding the plea offer and the investigation into the repair shop. *See*, *e.g.*, (Doc. 22 at 9, 17.) Although Petitioner's factual allegations that his counsel withheld the Destruction Request from him and did not confer with him about the jury note conflict with his counsels' affidavits, those factual disputes do not require resolution in an evidentiary hearing because, even if true, Petitioner has failed to establish that he was prejudiced thereby. Where, as here, the record establishes that a petitioner cannot demonstrate one of the *Strickland* prongs, no evidentiary hearing is necessary. *United States v. Fields*, 949 F.3d 1240, 1268 (10th Cir. 2019) (holding that an evidentiary hearing was unnecessary where, despite disputes of fact regarding counsels' performance, there were no disputes related to prejudice to the petitioner); *United States v. Jones*, 816 F. App'x 300, 301 (10th Cir. 2020) (where "the record conclusively shows [petitioners are] not entitled to relief, [they are] not entitled to an evidentiary hearing"); *United States v. Jimenez*, No. 08-CV-331 RB/WDS, 2009 WL 10708109, at *4 (D.N.M. Mar. 26, 2009) ("An evidentiary hearing on a claim of ineffective assistance of counsel is required only if the factual allegations, if true, would meet both prongs of the *Strickland* test."); *see also* 28 U.S.C. § 2255(b). Hence, I recommend that the Court deny Petitioner's request for an evidentiary hearing.

## V.   RECOMMENDATION

For all the foregoing reasons, I recommend that the Court **DENY** Petitioner's request for a hearing and Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Docs. 1, 3) and **DISMISS** this matter with prejudice.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**